Filed 1/8/14  P. v. Nava CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICARDO MANUEL NAVA, JR., et al.,<br><br>    Defendants and Appellants. | 2d Crim. No. B233532<br>(Super. Ct. No. 1259550)<br>(Santa Barbara County) |

Ricardo Manuel Nava, Jr., Ruben Nicholas Mize, Bryan Steven Medinilla, and Raul Junior Diaz appeal the judgments entered against them following two jury trials. In the first trial, appellants were charged with the murder of Lorenzo Carachure (Pen. Code,[1] § 187, subd. (a)), the attempted murders of Noe Carachure and Rogelio Hernandez (§§ 187, 664), and active participation in a criminal street gang (§ 186.22, subd. (a)).  Mize was separately charged with the attempted murder of Prospero Sotelo.[2] Appellants were convicted of the substantive gang offense, and Mize was convicted of the attempted murder of Sotelo.  The jury was unable to reach a verdict on the remaining counts, and the court declared a mistrial as to those charges.  On retrial, Mize and

---

[1] All further undesignated statutory references are to the Penal Code.

[2] Appellants were juveniles when the crimes were committed and were charged as adults pursuant to section 707, subdivision (d) of the Welfare and Institutions Code.

Medinilla were found guilty of first degree murder (§ 187, subd. (a)), and Nava and Diaz were convicted of second degree murder. The jury also found true allegations that the murder was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and that Mize and Medinilla personally used a deadly weapon in committing the offense (§ 12022, subd. (b)(1)). Appellants were found not guilty of the attempted murders of Noe Carachure and Rogelio Hernandez. In a bifurcated proceeding, Nava admitted two prior serious or violent felony strike convictions (§§ 667, subds. (a)(1), (b) - (i), 1170.12, subds. (a) - (d)). The trial court sentenced Medinilla to a total term of 26 years to life in state prison, and Mize to a total term of 41 years to life. Nava and Diaz were each sentenced to state prison terms of 15 years to life.[3]

Appellants contend (1) the court abused its discretion in refusing to bifurcate the gang allegations; (2) the court erred in failing to give accomplice instructions for witness Lucero Uribe; (3) the court erred in limiting appellants' arguments regarding their ages and its effect on their ability to premeditate; (4) the sentences imposed for the gang offense should have been stayed under section 654; and (5) cumulative error compels the reversal of their convictions.[4] Nava, Medinilla, and Diaz also contend the court abused its discretion in denying their motion to sever Mize's trial. Diaz and Nava further claim the court erred in denying their motion for a mistrial, while Nava also challenges the sufficiency of the evidence supporting his murder conviction. Medinilla separately challenges the court's failure to modify the jury

---

[3] At the parties' request, the court also recalled Nava's sentence in an unrelated case and resentenced him to 19 years in state prison.

[4] Although these contentions are not raised and briefed by every appellant, they join in each others' arguments to the extent they can benefit from them. (Cal. Rules of Court, rule 8.200(a)(5).) Appellants have not, however, offered specific arguments as to how the issues raised by the other parties affected their unique circumstances and the facts surrounding their own convictions. "Joinder may be broadly permitted [citation], but each appellant has the burden of demonstrating error and prejudice [citations]." (*People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11 (*Nero*).) "Because of the need to consider the particulars of the given case, rather than the type of error, the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice. [Citations.]" (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106.) Appellants make no particularized prejudice arguments. In any event, we conclude (with the exception of the section 654 claim) that all of appellants' claims are without merit.

instructions on vicarious liability (CALCRIM No. 400). Mize additionally faults the court for admitting evidence of two rap songs he wrote, and failing to instruct on assault with a deadly weapon as a lesser offense of the charge of the attempted murder of which he was convicted. We shall order the three-year concurrent sentences imposed for the active gang participation count stayed under section 654. Otherwise, we affirm.

STATEMENT OF FACTS

In July 2007, appellants were active members of Santa Barbara's Eastside gang (Eastside). Eastside's primary criminal gang activities are assaults with deadly weapons, murders and attempted murders, and witness intimidation. As an Eastside "shot-caller," Mize made decisions for the gang and directed the activities of its members.

Eastside's primary rival is the Westside gang (Westside). Predictably, Eastside claims the east side of Santa Barbara as its territory, while Westside claims the west side. Eastside members, who refer to themselves as "Eastsiders," designated the Pennywise store on Montecito Street as their primary "hangout." Westside members, or "Westsiders," usually gathered at either the Guadalajara Market on San Pascual Street, or the nearby Westside Boys and Girls Club.

From 2006 through 2008, Eastsiders and Westsiders engaged in approximately 200 knife fights. Shortly before the murder of which appellants were convicted, Westsider Richard Garcia stabbed Mize's brother, Eastsider Robert Martinez. Martinez survived. Eastside then issued a "green light" on Garcia, which meant he was to be killed in retaliation for the attack.

Lucero Uribe was Mize's girlfriend. On the night of July 16, 2007, Uribe's brother Carlos Diaz drove Uribe and her friend Carla Neri to the Pennywise store on Montecito Street. Carlos[5] was not a gang member, but he knew Mize through Uribe. Carlos waited in his truck while Uribe and Neri went in the store. Appellants were at the

---

[5] Aside from appellants, all parties who have the same last name as another party are referred to by their first names. Carlos, who is not related to Diaz, was charged with murder and pled guilty to being an accessory after the fact (§ 32). As part of his plea deal, he promised to testify truthfully in this case. Uribe was never charged in connection with the case and was granted immunity for her testimony.

store with Emilio Mora, an Eastside shot-caller.[6] Either Mize or Medinilla asked Uribe if Carlos would give them a ride to the west side of town. Uribe conveyed the request to Carlos. Before Carlos had the opportunity to respond, appellants got into the cab of his truck and Mora jumped in the truck bed. Mora looked through the window into the cab and saw Mize, Nava, and Medinilla holding switchblade knives.

Carlos drove appellants and Mora to San Pascual Street. As Carlos was driving down San Pascual, he saw Westsiders Lorenzo "Nemo" Carachure, his cousin Noe Carachure, and Rogelio Hernandez walking on the right side of the street. Carlos continued driving and heard someone in the truck say "Westside" or "Westsider."

Mora told Carlos to slow down and stop. When Carlos stopped the truck and turned off the engine and lights, appellants and Mora jumped out and ran toward Lorenzo, Noe, and Hernandez. One of the Eastsiders yelled "Eastside Traviesos."[7] One of the Westsiders responded by throwing gang signs and yelling, "Westside." Mize asked, "What's up?"

The Westsiders threw bottles at the Eastsiders, hitting Mora. Hernandez, who had been walking with a bicycle, threw the bicycle at the Eastsiders and Mora picked it up. At that point, everyone ran toward the Guadalajara Market. Witnesses saw several men converge on Lorenzo, then heard the sound of glass breaking. Shortly thereafter, Lorenzo could be heard pleading for his life. Diaz hit Lorenzo in the head with a carjack, causing him to fall to the ground. Mize threw Hernandez's bicycle at Lorenzo. As Lorenzo lay pinned on his back under the bicycle, Mize pulled out a knife and stabbed him twice in the neck and once in the abdomen. Witnesses heard two or three of the participants say "fuck him up." Medinilla stabbed Lorenzo in the chest or stomach and Mora said, "[s]tick 'em."

---

**6** Mora was also charged with murder in this case. He pled guilty to the attempted murders of Noe Carachure and Rogelio Hernandez and admitted gang enhancement allegations in exchange for a state prison sentence of 19 years 8 months. As a condition of his plea agreement, he also agreed to testify truthfully in this case.

**7** "Traviesos," "Eastside Familia," and the "Krazies" are the three Eastside cliques.

4

Nava chased Noe and Hernandez as they ran toward the market. Diaz joined Nava after hitting Lorenzo with the carjack. Noe was stabbed and punched in his rib cage and legs. He hit either Nava or Diaz with a stick. Hernandez was hit with a bottle and suffered a stab wound to his right arm.

Carlos saw what was happening and started to drive away. Mize yelled for him to stop. Carlos stopped his truck and Mize, Medinilla, and Mora got in. Carlos drove to Mize's house, where all three passengers got out. Uribe and Neri arrived at Mize's house after Carlos left.

Witnesses to the incident called 911. The police arrived to find Lorenzo was lying on a driveway surrounded by several people. Noe cradled Lorenzo's head and spoke to him in Spanish. Lorenzo had a large stab wound to his neck that was bleeding heavily. One of the responding officers applied a gauze pad with pressure to the wound while waiting for the paramedics to arrive. Lorenzo was transported to the hospital, where he died from his stab wounds.

At 10:30 p.m. that night, Mize knocked on Martinez's bedroom window. Martinez went outside and saw Mize, Medinilla, Uribe, and Neri. Mize and Medinilla were both panicked and nervous and asked Martinez to help them dispose of some knives. Medinilla said, "I stabbed that motherfucker." Mize also admitted stabbing Lorenzo. Martinez drove Mize and Medinilla to Goleta Beach, dropped them off at the entrance, and returned to pick them up a few minutes later. Martinez dropped Medinilla off at a Vons market in Montecito, then drove home with Mize.[8]

Medinilla was interviewed by the police on July 20, 2007. His right eye was bruised and red. He said he had been attacked by three men a couple of days earlier. Medinilla subsequently told Martinez he participated in the attack on Lorenzo in retaliation for the stabbing of Martinez. Medinilla told Uribe he was involved in the fight but was not specific. About a week after the murder, Medinilla confided in his friend

---

[8] Mora testified that he was with Mize and Medinilla, but stayed in the car while they disposed of the knives. Although Martinez did not recall Mora being with them, he could not say for certain who was there because he had smoked marijuana and may have also smoked methamphetamine.

5

Denise Sandoval that he had stabbed a Westsider. Medinilla said he had kicked and stomped on the victim before stabbing him in the neck with a stick.

The day after the murder, Diaz saw Neri and told her not to say anything about what had happened. Within a week of the crime, Mora saw Diaz at the Pennywise store. Diaz was holding a carjack and said, "I hit the guy with this." A couple of weeks later, Diaz saw Uribe at school and told her he had fought one of the Westsiders.

Three days after the murder, Mize told fellow Eastsider Jose Herrera that he had beaten up and stabbed a couple of Westsiders and had disposed of the evidence.[9] Two months later, Mize told Eastsider Octavio Marin that he "stuck" a Westsider named "Nemo." Mize seemed proud of his actions and said, "Screw that Westsider." Mize went on to state that he and other Eastsiders dressed in black and stabbed a Westsider walking on San Pascual Street. Mize also told Marin who was present during the attack, although the individuals he named did not include appellants. Mize said he had stabbed the victim about 30 times. Around the same time, Mize told his cousin, Eastsider Christopher Diaz,[10] that he had stabbed Lorenzo in the neck. During the same conversation, Medinilla told Christopher he had stabbed Lorenzo in the stomach.

Within a week of his conversation with Mize and Medinilla, Christopher agreed to wear a wire to record any subsequent conversations. On April 1, 2008, Christopher was wearing a wire when he picked Mize up from a juvenile facility in Woodland Hills and drove him back to Santa Barbara. As they were passing the spot

---

[9] Herrera was arrested in an unrelated case for committing a robbery with another Eastsider. As part of his plea agreement, he agreed to testify truthfully in the instant case and several others. In addition to recounting Mize's admission, Herrera testified that Mize had called on the night of the murder and asked if Herrera could take him "gang banging" with a "couple of homies." Herrera told Mize he could not do so.

[10] Christopher had previously acted as a police informant and had participated in controlled drug buys. After arrests were made in this case, Christopher left town because he feared his informant activities would be discovered and he would be killed. He signed an informant agreement with the Department of Alcohol, Tobacco and Firearms (ATF), and he and his family were placed in the witness relocation program. Records reflected that Christopher received $278,827.27 from ATF in fiscal year 2009-2010, although he claimed it was less than that. He also received $54,777.48 for medical expenses, but claimed he did not know that ATF was paying for those expenses. He left the witness protection program of his own accord prior to trial and testified voluntarily.

where Lorenzo was killed, Mize referred to the crime. Christopher asked Mize where he went for the kill shot, and Mize replied "[i]n the throat." A redacted recording of the conversation was played for the jury and admitted into evidence.

Nava also confessed his role in the crime to several people. The day after the murder, Nava saw Herrera at the Pennywise store and told him he had stabbed a Westsider who hit him with a stick during a fight by the Guadalajara Market. About a week later, Nava told Neri he was responsible for what had happened and had stabbed two Westsiders. About a month after the murder, Nava told Uribe he had been in a fight and was the one who hit or hurt Lorenzo the most. In September 2007, Nava showed Marin a knife and said, "this is the exact knife that I killed Nemo with." On Halloween 2007, Nava bragged to Marin that he had stabbed Lorenzo and said, "I got this Weaksider, Nemo." As a reward for killing Lorenzo, Nava was jumped into the Traviesos clique. Nava fled to Mexico after the murder and got a teardrop tattoo.

Santa Barbara Police Detective Gary Siegel testified as the prosecution's gang expert. When presented with a hypothetical based on the case, Detective Siegel opined that Lorenzo's murder was committed in association with and for the benefit of the Eastside gang. The crime benefitted and promoted Eastside by creating fear within the community, thereby boosting the gang's notoriety and reputation for violence. Based on his training and experience, Detective Siegel also opined a gang member might get a teardrop tattoo to represent he had killed or seriously assaulted someone.

On January 18, 2008, Westsider Prospero Sotelo was walking near the place Lorenzo was killed when Mize and several other Eastsiders attacked Sotelo and repeatedly stabbed him. During the April 2008 recorded conversation between Mize and Christopher, Mize admitted his role in the crime and said, "that fool got stabbed sixteen [16] times[.]" When Mize was arrested on May 6, 2008, he said, "You guys got me on this one" and added, "I'll never see my dad again. He's an ex-con, so he can't visit me."

Appellants did not testify in their defense. Medinilla presented the testimony of a detective who interviewed Mora in connection with Lorenzo's murder. Mora said during the interview that although Medinilla participated in the attack,

7

Medinilla was standing nearby when Lorenzo was stabbed.  According to the detective, it was obvious from the outset of the interview that Mora was lying.

DISCUSSION

*Denial of Motion to Bifurcate Gang Allegations*

Appellants contend the court erred in denying their motion to bifurcate the gang allegations in the second trial.  They claim the gang evidence was admitted in violation of their due process rights because most of the evidence was not cross-admissible as to the substantive crimes.

We review the trial court's denial of appellants' motion to bifurcate the gang allegations for abuse of discretion.  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048 (*Hernandez*).)  The moving party bears the burden of showing a substantial danger of prejudice absent bifurcation.  (*Id.* at p. 1050.)  No such showing was made here.

A gang enhancement allegation is attached to the charged offense and usually inextricably intertwined with it.  Moreover, evidence of a defendant's gang affiliation is often relevant and admissible to prove identity, motive, modus operandi, specific intent and other issues.  (*Hernandez, supra*, 33 Cal.4th at p. 1049.)  Any inference of prejudice is dispelled, and bifurcation is unnecessary, when the gang enhancement evidence is relevant to prove the charged offense.  (*Id.* at pp. 1049–1050; see *People v. Lee* (2011) 51 Cal.4th 620, 644.)  Cross-admissibility is not essential, however.  As our Supreme Court has explained:  "Even if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself—for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged—a court may still deny bifurcation.  In the context of severing charged offenses, we have explained that 'additional factors favor joinder.  Trial of the counts together ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials.' [Citation.]" (*Hernandez, supra*, at p. 1050.)  Bifurcation is appropriate, by contrast, when the gang evidence is minimally

8

probative and so inflammatory it threatens to sway the jury to convict without regard to actual guilt. (*Id.* at p. 1051; *People v. Albarran* (2007) 149 Cal.App.4th 214, 227–228.)

In denying the bifurcation motion, the court stated: "I think here the gang enhancement allegations and the facts necessary to prove that are interwoven with the underlying charges. And that therefore . . . there's not any substantial prejudice to leaving the matters together. [¶] The evidence is cross-admissible I think with regard to the elements of the gang enhancement. And what I anticipate the evidence is going to show with regard to the defendants' membership in a gang, and that membership, promotion of that gang being a motivator in what happened or what allegedly happened. The group going to the west side, engaging in an altercation with three opposing gang members."

There was no abuse of discretion. "Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*Hernandez, supra*, 33 Cal.4th at p. 1049.) Here, the evidence of appellants' gang affiliation and activities was admissible and highly relevant to show that appellants had a motive for attacking Lorenzo, and that they acted with the specific intent necessary to prove murder.

Appellants claim "the jury heard a repetitive cascade of superfluous and prejudicial gang-related testimony about all of the defendants that existed solely in the context of proving the gang enhancement." We disagree. As we have explained, the majority of gang evidence was relevant to prove the primary contested issues relating to whether appellants were guilty of murder, not merely whether they committed the crime for the benefit of their gang. To the extent some of the gang evidence was "repetitive" and/or "superfluous," appellants did not move to limit the *amount* of gang-related evidence; rather, they sought to exclude *all* of it. As for the evidence being "prejudicial," it was not rendered inadmissible simply because it "may have led the jury to the ineluctable conclusion" that appellants were guilty of murder. (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1551.) The fact that the evidence is highly incriminating

9

simply increases its weight.  Moreover, any danger that the gang evidence might unfairly prejudice appellants is dispelled by the overwhelming evidence of their guilt.  Because appellants fail to demonstrate that the court misapplied state law in denying their motion to bifurcate the gang allegations, their federal due process claim also fails.

In challenging the court's refusal to bifurcate the gang enhancement allegations, Nava takes particular issue with Detective Siegel's expert gang testimony. Although Nava does not dispute the propriety of the detective's answer to a hypothetical question that closely tracked the evidence (*People v. Vang* (2011) 52 Cal.4th 1038, 1048), he asserts that "as to [Nava], its prejudicial effect eclipsed its probative value under [Evidence Code] section 352."  He claims this is so because "the prosecution failed to marshal sufficient evidence to support a finding that [Nava] aided and abetting [*sic*] the stabbing of [Lorenzo]."  He further complains that "[t]he trial court's decision to deny bifurcation of the gang enhancement also opened the door for the prosecution to pile on evidence about [Nava's] criminal record and other bad acts to support the fact that he was a gang member."  Nava did not object to Detective Siegel's testimony on these grounds, so his claim is forfeited.  In any event, as we shall later explain, there is no merit in Nava's claim that the evidence is insufficient to support his conviction of second degree murder under an aiding and abetting theory.  (See *infra*, pp. 22-24.)  Moreover, any error in admitting the challenged evidence was rendered harmless by other evidence, such as Nava's admissions to four different people that he participated in the killing.  In light of these admissions, it is not reasonably probable that Nava would have achieved a more favorable result had the challenged evidence been excluded, be it through bifurcation or an evidentiary ruling.  (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); *People v. Gonzales* (2011) 51 Cal.4th 894, 924 [exercise of discretion under Evidence Code section 352 subject to *Watson* harmless error standard of review].)[11]

---

[11] Nava asserts that any error in admitting Detective Siegel's testimony is subject to the "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24, because "the hypothetical cut to the heart of [Nava's] defense and denied him due process under the United States Constitution . . . ."  Aside from the lack

*Accomplice Instructions for Witness Uribe*

CALCRIM No. 335 instructed the jury that Mora, Martinez, and Carlos were accomplices as a matter of law and that their testimony thus had to be viewed with caution and corroborated by other evidence. The jury was not so instructed as to Uribe, nor was it instructed that her testimony had to be corroborated if she was found to be an accomplice (CALCRIM No. 334). Appellants claim this amounts to reversible error.

Section 1111 states: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . ." An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (*Ibid.*) The definition of accomplice "encompasses all principals to the crime [citation], including aiders and abettors and coconspirators. [Citation.]" (*People v. Stankewitz* (1990) 51 Cal.3d 72, 90 (*Stankewitz*).)

"It is well settled that the phrase 'liable to prosecution' in section 1111 means, in effect, *properly* liable. Any issues of fact determinative of the witness's factual guilt of the offense must be submitted to the jury. Only when such facts are clear and undisputed may the court determine that the witness is or is not an accomplice as a matter of law. [Citations.]" (*People v. Rodriguez* (1986) 42 Cal.3d 730, 759.)

"When a jury receives substantial evidence that a witness who has implicated the defendant was an accomplice, a trial court on its own motion must instruct it on the principles regarding accomplice testimony. [Citation.] This includes instructing the jury that an accomplice's testimony implicating the defendant must be viewed with caution and corroborated by other evidence. [Citations.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1223.) The defendant has the burden of proving that a witness is an accomplice by a preponderance of the evidence. (*People v. Tewksbury* (1976) 15 Cal.3d 953, 968 (*Tewksbury*).) A person's mere knowledge that a crime might be committed by another in the future or failure to prevent it does not make that person an accomplice.

---

of support for this proposition, the overwhelming nature of the evidence would also render any error harmless under *Chapman*.

11

(See *People v. Horton* (1995) 11 Cal.4th 1068, 1116; *Stankewitz, supra*, 51 Cal.3d at pp. 90–91.) "Providing assistance without sharing the perpetrator's purpose and intent is insufficient to establish that a person is an accomplice. [Citation.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 191.)

The court did not err in failing to instruct the jury that Uribe was an accomplice as a matter of law. The answer to the question whether the court should have instructed the jury to determine whether Uribe was an accomplice, however, is less clear. On the one hand, it can be said Uribe merely asked her brother to give her then-boyfriend and his friends a ride to the west side. On the other hand, although Uribe ostensibly asked, she effectively made the decision by falsely telling Mize that Carlos had agreed to the request. The People correctly note that Uribe was not an Eastsider, yet it is reasonable to infer that she knew her boyfriend and his friends were members of the gang. Uribe also knowingly aided Mize and his fellow Eastsiders in obtaining a nighttime ride to the *west* side of town, which was rival gang territory. Moreover, Uribe was offered immunity for her testimony. While the People correctly note that this fact is insufficient by itself to compel a finding that Uribe was an accomplice (see *Tewksbury, supra*, 15 Cal.3d at p. 960), it nevertheless lends support for such an inference.

Ultimately, it does not matter whether the court should have given accomplice instructions as to Uribe because her testimony was corroborated by other evidence. (*People v. Lewis* (2001) 26 Cal.4th 334, 370.) "Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. [Citations.] It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified. [Citations.] It is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*People v. Valdez* (2012) 55 Cal.4th 82, 147–148.)

Here, there is independent corroborating evidence that tends to connect appellants to the commission of the crimes. All four appellants confessed to their involvement. Moreover, the jury was instructed to assess the credibility of all witnesses

12

by considering their bias and other factors that might lead them to be less than truthful. (CALCRIM No. 105.) Even in the absence of corroboration, we must affirm if it is reasonably probable that the error did not contribute to the verdicts. (*Watson, supra*, 46 Cal.2d at p. 836; *People v. Gonzales* (2011) 52 Cal.4th 254, 304.) Any error in failing to instruct on accomplice liability as to Uribe was harmless.

*Limitation of Arguments on Age*

Appellants contend the court violated their Sixth Amendment right to assistance of counsel by limiting counsel's reference to appellants' ages and precluding them from arguing as a matter of common knowledge that people of appellants' ages act rashly and impulsively. We disagree.

The trial court has discretion to control the proceedings during the trial, including the argument to the jury. (§ 1044; *People v. Ponce* (1996) 44 Cal.App.4th 1380, 1387.) Absent a showing of an abuse of discretion, we must uphold the trial court's actions in this regard. (*People v. Cline* (1998) 60 Cal.App.4th 1327, 1334.) Even if the court has abused its discretion under section 1044, the defendant is not entitled to reversal unless he can show a reasonable probability he would have obtained a more favorable result had the error not occurred. (*People v. Garcia* (1986) 183 Cal.App.3d 335, 347 (*Garcia*); *Watson, supra*, 46 Cal.2d at p. 836.)

Prior to closing arguments, Mize's attorney asked that he be allowed to argue as "a general principle of human development that teenagers, especially around the age these defendants were, . . . tend to be more impulsive." Over the prosecutor's objection, the court allowed counsel to argue that appellants' ages were relevant to the extent they could be tied to the facts of the case. Counsel was prohibited, however, from arguing as a matter of common knowledge that individuals of a certain age are impulsive or rash. The court reasoned: "The argument of counsel is always restricted ultimately by the facts brought out during trial. . . . [¶] The age of the defendants may have some relevance as it applies to the facts of the case. . . . [Defense counsel] may not argue or suggest what everyone may know. In fact, we don't know what everyone knows or what their common experiences are . . . . [¶] . . . The best way to avoid crossing the line is not

13

to get too close to it. So by way of example, he is young, therefore he is impulsive, compulsive, or assigning some other trait to one or more of the defendants simply because of age crosses the line. The defendant acted impulsively because, and then referring to the specific facts of the case would seem to me to be appropriate argument."

Mize's counsel responded that he had asked the investigating officer Mize's age and the time of the offenses and offered, "I would be satisfied if the Court took judicial notice of the birth dates of the defendants that are stated in the information filed by the People. That's all I want." Over the prosecutor's objection, the court then indicated it would take judicial notice of appellants' birth dates.

At the beginning of his closing argument, Mize's attorney informed the jury of appellants' ages. Counsel went on to argue that the decision to kill Lorenzo was "momentary" and was made "rashly, impulsively and without careful consideration." Medinilla's attorney argued that his client "was a 15 year old kid who was out there, probably over his head, being led around by 19 year old Emilio Mora and others." In concluding, counsel argued that Medinilla "certainly didn't know . . . what the stabber was going to do, if you find that to be Mr. Mize, he had no idea, and it was not foreseeable in his 15-year-old mind." Nava and Diaz offered no argument on the issue.

Appellants did not object to the ruling they now challenge. Indeed, Mize's attorney made clear that he merely wanted the court to take judicial notice of appellants' birth dates, and the court did so. Appellants' claim that the court improperly restricted their arguments is thus forfeited. In any event, the court's ruling did not preclude counsel from urging jurors to apply their own experiences in deciding whether the evidence— which included appellants' ages—established they had the required mental state to commit murder. Rather, the court merely precluded counsel from arguing it is "common knowledge" that individuals of a certain age generally act rashly and impulsively, such that they are incapable of premeditating. In so ruling, the court correctly found that the proffered proposition is *not* a matter of common knowledge or experience.

In arguing to the contrary, Medinilla relies on *Roper v. Simmons* (2005) 543 U.S. 551, in which the Supreme Court held that capital punishment for defendants who

14

were under the age of 18 when they committed their crimes constitutes cruel and unusual punishment. Medinilla quotes the case as follows: "First, as any parent knows and as the scientific and sociological studies respondent and his *amici* cite tend to confirm, '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.'" (*Id.* at p. 569.) This passage, however, demonstrates the wisdom of the court's ruling in this case. As the court noted, "we don't know what everyone knows or what their common experiences are or whether or not they were parents or, if they were, how their children got through adolescence." It is one thing to state that parents might know and studies might tend to indicate that young people are more likely than adults to demonstrate immaturity and lack of responsibility. It is quite another to state as a matter of common knowledge that young people of appellants' ages act rashly and impulsively merely by virtue of their ages. Nothing in the court's ruling precluded appellants from offering evidence—be it in the form of expert testimony, accepted studies, or facts relating to appellants' own life experiences— indicating that appellants' youth interfered with their ability to form the intent to commit murder. Moreover, nothing precluded jurors from relying on their own life experiences in making that determination.

Even if we were to assume the court abused its discretion, the error would be harmless. Medinilla's attorney was able to argue that Medinilla "was a 15 year old kid" who acted under the influence of others who were significantly older. He also offered that the killing "was not foreseeable in his 15-year-old mind." Moreover, the jury did not have to find that Mize and Medinilla acted with mature and meaningful reflection in order to find them guilty of first degree murder. (§ 189; *People v. Smithey* (1999) 20 Cal.4th 936, 979.) Finally, the evidence of appellants' guilt was overwhelming. Because it is not reasonably probable appellants would have achieved a more favorable result absent the alleged error, their claim fails for lack of prejudice. (*Garcia, supra,*183 Cal.App.3d at p. 347; *Watson, supra*, 46 Cal.2d at p. 836.)

15

*Section 654*

In sentencing appellants, the court imposed concurrent three-year terms for the substantive gang offense (§ 186.22, subd. (a)). Appellants assert that these sentences must be either stayed under section 654 or vacated as a double jeopardy violation. The People correctly concede that the sentences must be stayed because appellants were separately punished for the crimes upon which the gang offenses were based. (*People v. Mesa* (2012) 54 Cal.4th 191, 199.) We shall order the judgments modified accordingly.

*Denial of Motion to Sever Mize's Trial*

Nava, Medinilla, and Diaz contend the court abused its discretion in denying their motion to sever Mize's trial.[12] They claim that a joint trial resulted in gross unfairness to them and violated their state and federal due process rights to a fair trial.

"Section 1098 expresses a legislative preference for joint trials. The statute provides in pertinent part: 'When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials.' [Citations.] Joint trials are favored because they 'promote economy and efficiency' and '"serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."' [Citation.] When defendants are charged with having committed 'common crimes involving common events and victims,' as here, the court is presented with a 'classic case' for a joint trial. [Citation.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40 (*Coffman*).)

We review the denial of a severance motion for abuse of discretion, based on the facts as they appeared at the time of the ruling. (*Coffman, supra*, 34 Cal.4th at p. 41.)[13] "[S]everance may be appropriate 'in the face of an incriminating confession,

_____

**12** Appellants brought severance motions in both trials, yet concede that the motion brought in the first trial was untimely. Accordingly, appellants' claim does not apply to their convictions for active gang participation.

**13** Nava erroneously frames the issue as whether the court abused its discretion in admitting evidence of Mize's prior bad acts under Evidence Code section 1101, subdivision (b). The only evidence challenged on this ground was Mize's rap lyrics, and Mize was the only defendant who objected. As we shall explain (*infra*, pp. 26-29), the court did not err in admitting that evidence. To the extent appellants contend that other

16

prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.'" (*Id.* at p. 40, fns. omitted.) "[S]everance may [also] be called for when 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.' [Citations.]" (*Id.* at p. 40.) "[L]ess drastic measures than severance, such as limiting instructions, often will suffice to cure any risk of prejudice. [Citation.]" (*Id.* at p. 40.) Even if the court's ruling amounts to an abuse of discretion, reversal is mandated only if the moving party demonstrates a reasonable probability he would have achieved a more favorable result if he had been tried separately. (*Id.* at p. 41.)

In denying the severance motion in the second trial, the court reasoned: "[I]t is the Court's impression that, number one, the spillover effect or so-called spillover effect [in the first trial] was minimal and in fact well contained by the limiting instructions given throughout the trial, as well as in the jury instructions themselves. . . . [¶] . . . So again, many of those issues came up the first time around and I think we were able to make things work. . . . [¶] . . . The long and the short of it is that the motion is denied with regard to severing. . . . [T]he California Constitution provides for joint trials. The exception is not having a joint trial. The exception is not that in every gang case there should be joint trials simply because there are interlocking facts, allegations and theories that in fact one assumes is the reason behind the [c]onstitutional preference for joint trials."

The court's ruling was not an abuse of discretion. "Because defendants were charged with having committed 'common crimes involving common events and victims' [citation], this was a 'classic case' for a joint trial." (*People v. Hardy* (1992) 2 Cal.4th 86, 168; *Coffman, supra*, 34 Cal.4th at p. 40.) The facts known to the court at the time of its ruling demonstrated that none of the defendants would be unfairly prejudiced

_____

evidence of Mize's prior bad acts was cumulative or otherwise inadmissible under Evidence Code section 352, the claim was not raised below and is thus forfeited.

by a joint trial. As the court noted, it had successfully dealt with issues regarding evidence that was only admissible against Mize during the first trial. The majority of the evidence offered against Mize was also admissible against Nava, Medinilla, and Diaz. When evidence only admissible against Mize was elicited, the jury was admonished to that effect. Instructions that embodied the prior admonitions were also given at the conclusion of the trial.[14] We presume the jury understood and followed these instructions.[15] (*People v. Homick* (2012) 55 Cal.4th 816, 879 (*Homick*).) Moreover, a significant portion of the evidence that was not cross-admissible consisted of Nava, Medinilla, and Diaz's self-incriminating statements. Even if accepted Diaz's assertion that a separate trial of Nava, Medinilla and Diaz would have been "relatively short," a joint trial was undeniably more efficient. There is no indication that appellants presented

---

[14] The jury was instructed: "I instructed you during the trial that certain evidence was admitted only against certain defendants. You must not consider that evidence against any other defendant." (CALCRIM No. 304.) The jury was also instructed pursuant to CALCRIM No. 375 as follows: "The People presented evidence that defendant Ruben Mize committed other offenses that were not charged in this case. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that Ruben Mize in fact committed the uncharged offenses. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that the defendant Ruben Mize committed the uncharged offenses, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not: [¶] A. The defendant acted with the intent to willfully, deliberately, and with premeditation to commit murder in this case, or [¶] B. The defendant had a motive to commit the offenses alleged in this case, or [¶] C. The defendant's alleged actions were the result of mistake or accident, or [¶] D. The defendant had a plan or scheme to commit the offense alleged in this case. [¶] In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offense and act and the charged offense. [¶] Do not consider this evidence for any other purpose."

[15] Nava claims that "while most of the testimony about Mize was preceded by a limiting instruction, it often is not clear from the record that the jury was told when the instruction no longer applied." Assuming this claim is accurate, any such confusion on the jury's part logically would have enured to the benefit of Nava, Medinilla, and Diaz.

18

antagonistic defenses such that they would be prejudiced by a joint trial.  (See *Hardy*, at p. 168.)  None of the factors warranting severance is present here.[16]

In any event, any error in denying severance was harmless.  The evidence against Nava, Medinilla, and Diaz—which included their own admissions—was substantial.  Although Nava correctly notes that the jury in the first trial was unable to reach a verdict on the murder count, the record reflects that the jury was merely unable to agree whether appellants acted with premeditation and deliberation, and not whether they were guilty of murder.[17]  Because it is not reasonably probable that Nava, Medinilla, and Diaz would have achieved a more favorable result had they been tried separately from Mize, the denial of their severance motion provides no basis for reversal of their convictions.  (*Coffman, supra*, 34 Cal.4th at p. 41.)[18]

*Motion for Mistrial*

Nava and Diaz contend the court committed reversible error in denying their motion for a mistrial after a witness recounted Mize making statements that potentially incriminated them.  They claim that this testimony, which the court immediately struck and admonished the jury not to consider, violated their confrontation rights under *Bruton v. United States* (1968) 391 U.S. 123, and its progeny.

---

[16] In arguing that the denial of his severance motion amounts to an abuse of discretion, Nava relies on the stricken testimony that led Nava, Medinilla, and Diaz to move for a mistrial.  This evidence (which we address *infra*, at pages 20 through 22) is irrelevant to our evaluation of the court's severance ruling, which is "judged on the facts as they appeared at the time of the ruling."  (*Coffman, supra*, 34 Cal.4th at p. 41.)

[17] The prosecutor in the first trial declined the option of dismissing the first degree murder charges and allowing the jury to consider the lesser offense of second degree murder.  (See *People v. Bordeaux* (1990) 224 Cal.App.3d 573, 576; see also *People v. Fields* (1996) 13 Cal.4th 289, 311.)

[18] In arguing that the denial of his severance motion was prejudicial, Nava asserts that the closeness of the case is reflected in the jury's finding "that [Nava] did not use a knife as [Herrera, Neri, and Marin] testified he told them."  According to Nava, this demonstrates that the jury "did not believe those witnesses who testified he said he had a knife."  Aside from ignoring the possibility that the jury found it was Nava who lied about his level of involvement in an attempt to bolster his reputation, Nava also fails to appreciate that the jury made no finding that Nava did not use a knife, either expressly or implicitly.  The charges did not include any allegation that Nava had used a weapon in committing the crime.

We review the court's denial of a mistrial motion for an abuse of discretion. (*People v. Price* (1991) 1 Cal.4th 324, 428.) A motion for mistrial is properly denied unless the error precipitating it cannot be cured by limiting instructions or some other method. "'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'" (*People v. Cooper* (1991) 53 Cal.3d 771, 838-839.)

Nava and Diaz moved for a mistrial based on statements that Neri and Christopher attributed to Mize. Neri testified that on the night of the crime, she heard Mize say that "[h]e thought they killed someone." Mize objected, and a bench conference followed. The court then instructed the jury that "[w]ith regard to the last answer, . . . the Court will order that answer be stricken. The jury is admonished not to consider it for any purpose." When the prosecutor rephrased the question that prompted the stricken answer, Neri testified that Mize said "[t]hat he thought he killed . . . that they had killed somebody." The court immediately struck the answer and reiterated its prior admonishment that the jury was not to consider the evidence for any purpose.

Later that same day, the prosecution called Christopher to testify. Shortly before playing Christopher and Mize's recorded conversation, the prosecutor asked, "As you're driving by 700 San Pascual, what, if anything, does Mr. Mize say regarding the facts and circumstances of this case?" Christopher then quoted Mize as stating, "That's where we got that fool Nemo." Christopher proceeded to testify that he asked Mize "where he went for the kill shot," and that Mize replied, "The neck." Shortly thereafter, Diaz asked for a bench conference and moved for a mistrial on the ground that Christopher had referred to "we." Diaz also complained that Christopher had mentioned a carjack even though he had been admonished not to do so. Nava joined in the motion.

After hearing argument, the court ruled as follows: "With regard to the we's and they's, we've had discussions about that. The district attorney, it sounds like, has been making an effort to avoid those problems. He has no better control over his witnesses than any other attorney does. It's problematic. I don't think that this rises to the level of prejudice that would warrant a mistrial. [¶] My inclination is to go along with

20

[Diaz's] suggestion, that is, . . . move to strike it as nonresponsive and hope that the jury doesn't give more credence to the fact that we got up and came into chambers . . . discussing the issue, and trying to decide if that means that this was important or not. And if so, how and why it was important may cause more speculation on their part than the testimony itself. But to say that it was nonresponsive and strike it and tell them not to consider it and move on from there." Following a recess, the court instructed the jury that "the last answer from the witness was really nonresponsive to the question, so we're going to strike that answer, admonish the jury not to consider it for any reason."

There was no abuse of discretion. Nava's claim that Mize's hearsay statements violated his rights under the confrontation clause fails because the statements were excluded and the jury was admonished not to consider them for any purpose. Any reliance on the statement that Neri attributed to Mize is misplaced because no one moved for a mistrial based on that statement. Appellants have thus forfeited any claim that Neri's remarks warranted a mistrial. (See *People v. Lightsey* (2012) 54 Cal.4th 668, 719 [defendant who did not object or move for mistrial based on claim of prosecutorial misconduct "forfeited this aspect of his claim"].)

Moreover, appellants fail to establish that the error occasioned by the improper remarks was incurable. In addition to striking the remarks, the court promptly admonished the jury not to consider them for any purpose. Similar admonishments were given in the court's written instructions. Once again, we presume that every juror was capable of understanding and following these clear and straightforward instructions. (*Homick, supra*, 55 Cal.4th at p. 879.) Appellants offer nothing indicating otherwise. As the People note, appellants were in any event not directly incriminated by the references to "we" and "they." Other evidence demonstrates that Mize subsequently identified his accomplices by name and that appellants were not mentioned. Given the brief and vague references at issue, Mize's *ex*culpation of appellants, the court's curative instructions and admonishments, and overwhelming evidence of guilt that includes their own admissions, the denial of Nava and Diaz's mistrial motion was not an abuse of discretion.

21

*Sufficiency of the Evidence – Nava's Conviction*

Nava claims the evidence is insufficient to support his second degree murder conviction. He argues there is no evidence from which the jury could have found he acted as a direct perpetrator or an aider and abettor, or that he was guilty under a natural and probable consequences theory.

In reviewing the sufficiency of evidence to support a conviction, we examine the entire record and draw all reasonable inferences therefrom in favor of the judgment to determine whether there is reasonable and credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Streeter* (2012) 54 Cal.4th 205, 241.) Our review is the same in prosecutions primarily resting upon circumstantial evidence. (*People v. Stanley* (1995) 10 Cal.4th 764, 792.) "'An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise.'" (*Streeter,* at p. 241.) We do not redetermine the weight of the evidence or the credibility of witnesses. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

The evidence is sufficient to support Nava's conviction of second degree murder. In arguing to the contrary, Nava essentially ignores the applicable standard of review, which requires us to view the evidence in the light most favorable to the judgment. As we have noted, the record belies Nava's assertion that the jury "specifically rejected the allegation that [he] used a knife and found it not true." No such allegation was ever made. In any event, such a finding would provide no basis for us to conclude the evidence is insufficient to sustain a finding that he directly perpetrated the crime. (See *People v. Miranda* (2011) 192 Cal.App.4th 398, 405 ["under the inconsistent verdict doctrine, the 'not true' finding on the personal use enhancements does not inexorably lead to a finding that defendant was not the direct perpetrator of the substantive offenses"].) Nava admitted to several people that he stabbed Lorenzo during the altercation. Moreover, after the murder Nava got an "Eastside" tattoo on his face and a teardrop tattoo below his eye. When asked about the tattoo, Nava said he had gotten it after stabbing Lorenzo. Detective Siegel also offered expert testimony that a teardrop tattoo can

22

represent a murder or serious assault. This evidence is sufficient to support a finding that Nava was guilty as a direct perpetrator.

The evidence is also sufficient to support Nava's conviction of murder as an aider and abettor. Aider and abettor liability is established when a person who does not directly commit a crime assists the direct perpetrators by aid or encouragement, with knowledge of the perpetrators' criminal intent and with the intent to help them carry out the offense. (*People v. Beeman* (1984) 35 Cal.3d 547, 560-561.) "'[A]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.'" (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) Here, this showing is met by evidence that Nava armed himself with a knife immediately prior to the murder and chased and stabbed Noe and Hernandez, thereby preventing them from helping Lorenzo defend against the attack.

Finally, the evidence is sufficient to support Nava's conviction on the theory that the crime was a natural and probable consequence of an assault in which he directly participated. At the very least, Nava knowingly and deliberately participated in a gang assault. In light of the evidence, the jury could have reasonably found that a person in Nava's position would or should have known that the incident would escalate and ultimately result in a killing. (See *People v. Medina* (2009) 46 Cal.4th 913, 922-923.)

*CALCRIM No. 400*

Medinilla contends the court erred in failing to modify CALCRIM No. 400 by excluding language that an aider and abettor is "equally guilty" of a crime whether he directly perpetrated it or aided and abetted the perpetrator. (*Nero, supra*, 181 Cal.App.4th at pp. 517-518.) Medinilla did not request modification or clarification of the instruction in the trial court, so his claim is forfeited. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163–1165 (*Samaniego*).) Medinilla alternatively claims that his trial attorney provided ineffective assistance by failing to request modification. This claim fails because in light of the instructions as a whole and the circumstances of the case, there is no reasonable likelihood that the instruction misled the jury.

23

In evaluating a claim of instructional error, we examine the instructions to determine "whether there is a 'reasonable likelihood' that the jury understood the charge as the defendant asserts."  (*People v. Kelly* (1992) 1 Cal.4th 495, 525.)  In addressing this question, we "consider the specific language under challenge and, if necessary, the charge in its entirety."  (*Id.* at pp. 525-526.)  We must "determine whether the instruction, so understood, states the applicable law correctly."  (*People v. Warren* (1988) 45 Cal.3d 471, 487.)  An instruction can only be found to be ambiguous or misleading if, in the context of the entire charge, there is a reasonable likelihood that the jury misconstrued or misapplied its words.  (*People v. Harrison* (2005) 35 Cal.4th 208, 251–252.)

The jury was instructed pursuant to CALCRIM No. 400 that a person may be guilty of a crime if he directly committed the crime or if he aided and abetted someone else who committed the crime, and that a "person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it."  The jury was also instructed pursuant to CALCRIM No. 401 that an individual cannot be guilty of aiding and abetting unless the direct perpetrator committed the crime and the aider and abettor (1) knew of the direct perpetrator's intent; (2) shared the same intent as the direct perpetrator; and (3) did in fact aid and abet the perpetrator's commission of the crime.  Other instructions explained the degrees of murder and provided the requirements for first degree murder.  (CALCRIM No. 521.)  Those instructions made clear that in order to convict any defendant of first degree murder, the jury had to find he specifically intended to commit the crime and did so with premeditation and deliberation.

In *Nero, supra*, 181 Cal.App.4th at page 507, the court found that the "equally  guilty" language misled the jury in that case to believe the defendant could not be found guilty of a lesser offense than the second degree murder she aided and abetted.[19]  Here, the jury asked if it could find an aider and abettor guilty of a lesser offense under a natural and probable consequence theory, and the court answered that

<hr>

[19] The instruction at issue in *Nero* was a former version of CALJIC No. 3.00, which was substantially identical to CALCRIM No. 400.  Both instructions were amended in 2010 to make the "equally guilty" language optional.

question in the affirmative.  To the extent this exchange did not address the question whether a defendant who specifically intended to aid and abet murder could be found guilty of a lesser offense, the instructions made clear that a first degree murder conviction requires premeditation and deliberation.  (See *People v. Prettyman* (1996) 14 Cal.4th 248, 259 [an aider and abettor of a specific intent crime must share the perpetrator's specific intent].)  Based on the instructions as a whole, no reasonable juror would have concluded that a defendant who did not intend to aid and abet a premeditated and deliberate murder was nevertheless guilty of first degree murder.  (See *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1119–1120 [any error in CALCRIM No. 400's "equally guilty" language harmless where jury was also instructed with CALCRIM No. 401]; see also *Samaniego, supra*, 172 Cal.App.4th at p. 1166 ["It would be virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation, which is all that is required"].)  Any error arising from the "equally guilty" language was also harmless in light of the evidence demonstrating that Medinilla was found guilty not merely as an aider and abettor, but also as a direct perpetrator.  (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

### *Rap Songs*

Mize asserts the court abused its discretion in admitting two of his rap songs at both trials.  He characterizes the songs as improper character evidence and claims the evidence was irrelevant to establish his state of mind when he committed the murder of Lorenzo and the attempted murder of Sotelo.  He also argues that to the extent the evidence was relevant, it should have been excluded under Evidence Code section 352 as substantially more prejudicial that probative.[20]

---

[20] As we have noted, Mize was the only defendant who objected to the evidence, which was admitted solely against him.  On appeal, Nava contends the evidence was erroneously admitted in the context of his assertion that the court abused its discretion in declining to sever Mize's trial.  Although Nava, Medinilla, and Diaz have joined in each other's arguments to the extent they can benefit from them, they have forfeited the right to challenge the evidence by failing to object below.

Gang evidence that is logically relevant to some material issue other than character evidence is admissible if it is not cumulative or more prejudicial than probative. (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192.) The evidence should be excluded if it is only relevant to show a defendant's criminal disposition or bad character. (*People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449.) Where there is a gang allegation, gang evidence will usually be admissible. (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 930.) Moreover, gang evidence is admissible when it is relevant to prove motive or intent. (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1518.) Because motive is usually the incentive for criminal behavior, the probative value of motive evidence generally outweighs its prejudicial effect. Courts are thus granted wide latitude in admitting such evidence. (*People v. Gonzalez, supra*, 126 Cal.App.4th at p. 1550.)

Rap lyrics containing gang references have been held admissible in cases involving gang allegations. (*People v. Olguin* (1994) 31 Cal.App.4th 1355 (*Olguin*); *People v. Zepeda* (2008) 167 Cal.App.4th 25, 34–35.) In *Olguin*, the court rejected the appellant's claim that the lyrics were inadmissible character evidence and concluded the songs were relevant and admissible to show "his membership in [the gang], his loyalty to it, his familiarity with gang culture, and, inferentially, his motive and intent on the day of the killing." (At p. 1373.)

In 2007, Mize posted 10 "gangsta rap" songs on Youtube. Prior to the first trial, the prosecutor moved to admit three of the songs and Mize opposed the motion. The court ruled that the prosecution could play two of the songs: "Homicidal Thoughts," which was written and performed by Mize and Martinez, and "Untitled," which was written and performed by Mize. The third song, entitled "This Is Why He's Dead," was excluded because it was about an unrelated crime that occurred subsequent to the crimes with which Mize was charged. The court also indicated it would admonish the jury that it was not to consider the songs as evidence against the other defendants. The court issued an identical ruling, over Mize's objection, prior to the first trial. The jury was once again admonished that the evidence was only admissible against Mize.

26

In "Homicidal Thoughts," Mize identifies himself as "Chiko" and says, "Still I wanna gang bang till I fuckin drop  [¶]  Taking out the streets and get popped by the fucking cops, that's why I chose to rap so I could change my ways.  I don't want to be like my brother and get locked away, . . . if he asked me to pull the trigger I would pull it. My enemies are my target, those leva's will catch my bullet.  [¶]  . . . Homicidal thoughts running through my fucking head and they won't stop till I reach my fucking death."  In the next verse, Martinez, or "Lil Bullet," refers to "putting in work for that Eastside Krazies gang" and adds, "In these streets there is no choice but to gang bang."

In "Untitled," the song begins:  "It's Chiko Loko putt[i]ng it down from the TRS [Traviesos] if you have something to say about that go ahead and try to test, I'll put your ass to rest.  East Bruta [East Santa Barbara] is the best, fuck with me and your body will be in a blo[o]dy mess. . . . I haven't killed but I have the heart to do a one eighty seven homicide.  I can't wait till the day that I take somebody's life.  Homie don't get it twisted my trigger finger's not the person that I love, the kick of the Glock, the smell of the barrel burning. . . . [Y]ou know my barrio is considered my family[] so you fuck with one of them you're fucking with me."  Mize continues:  "Disrespect East Bruta fool and you are bound to get hit.  My Cuete [gun] is in my clutch, in my times I never miss . . . . [¶]  . . . I'm just gonna cause some chaos till I'm put in some fuckin cuffs, I'm a go out like a G and feed the cops some snuff.  [¶]  Fucking with me barrio please don't make me have to bust, disrespect me bitch I'll make sure your grave is dug. . . . I don't play any games and I bring that pain no matter what happens in my life, I'll still bang for the TRS gang."

These lyrics, in which Mize declares his readiness and willingness to kill anyone who "fucks" with him or his gang, were relevant to show intent and motive for the charged crimes.  (See, e.g., *People v. Lang* (1989) 49 Cal.3d 991, 1013-1016 [defendant's threat to "waste any mother fucker that screws with me" properly admitted to show intent].)  As the People note, Mize's intent was a central issue in the case. Moreover, the lyrics are relevant to prove Mize's intent regardless of when he wrote them.  (*Olguin, supra*, 31 Cal.App.4th at p. 1373.)  Because the evidence is relevant to

27

prove intent, its admission did not violate the statutory restriction on propensity or character evidence under Evidence Code section 1101, subdivision (a). (*People v. Barnett* (1998) 17 Cal.4th 1044, 1119.) Mize's attempts to distinguish or discredit the relevant authority are unavailing.

The court also properly exercised its discretion in excluding the evidence under Evidence Code section 352. In making this determination, we examine whether the probative value of the rap lyrics was "substantially outweighed by the probability that its admission [would] create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Prejudice in this context means the creation of an emotional bias against the defendant through evidence with little probative value. (*People v. Karis* (1988) 46 Cal.3d 612, 638.) "'[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." . . . In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging."' [Citation.]" (*Ibid.*) "Evidence Code section 352 is designed for situations in which evidence of little evidentiary impact evokes an emotional bias." (*Olguin, supra*, 31 Cal.App.4th at p. 1369.)

As we have explained, the rap songs were highly probative of Mize's intent and motive to commit the charged crimes. Although the songs "would undoubtedly be disturbing to most people[,] we cannot say [they were] substantially more prejudicial than probative, for [their] value in establishing defendant's [requisite mental state] to [commit first degree murder] was substantial." (*People v. Memro* (1995) 11 Cal.4th 786, 865.) "The mere fact the lyrics might be interpreted as reflective of a generally violent attitude could not be said 'substantially' to outweigh their considerable probative value." (*Olguin, supra*, 31 Cal.App.4th at p. 1373.)

We also note that the jury was instructed not to consider the gang evidence as proof that Mize was a person of bad character or that he had a disposition to commit crimes. We presume the jury understood and followed these instructions. (*People v. Lindberg* (2008) 45 Cal.4th 1, 26.) We conclude the evidence would not have evoked a bias against Mize for reasons unrelated to his guilt (see *People v. Scheid* (1997) 16

Cal.4th 1, 19) because the violence of the charged crimes themselves subsumes any additional prejudice from the lyrics. Because the evidence was highly probative of Mize's intent and motive to commit first degree murder and attempted murder, the trial court did not abuse its discretion in finding the prejudicial effect did not substantially outweigh the probative value of the evidence.

*NPC and Assault with a Deadly Weapon*

In the first trial, Mize was convicted of the attempted murder of Sotelo. In addition to direct liability, the jury was instructed on the theory that Mize could be found guilty of attempted murder as a natural and probable consequence (NPC) of an assault with a deadly weapon. Although the jury was also given instructions on the target offense of assault with a deadly weapon, it was not given the option of convicting him of that offense instead of attempted murder. Mize contends this was error. He claims that while assault with a deadly weapon is a lesser related offense to attempted murder and not a lesser *included* offense (*People v. Nelson* (2011) 51 Cal.4th 198, 215), the crime is "the functional equivalent of an element of the crime as pleaded" where, as here, it is identified as the target offense under an NPC theory.

Even if Mize is correct, his claim fails. If the jury relied on the NPC theory in convicting Mize (which is highly unlikely, given the prosecutor's argument and the state of the evidence), it necessarily decided not only that Mize had committed an assault with a deadly weapon, but also that attempted murder was an NPC of that crime. In doing so, the jury rejected a finding that Mize was merely guilty of assault. The error is thus harmless, whether it is characterized as the failure to instruct on lesser included offense (*People v. Koontz* (2002) 27 Cal.4th 1041, 1085-1086), or the failure to instruct on an element of an offense (*People v. Flood* (1998) 18 Cal.4th 470, 485). Moreover, "[i]n determining whether a failure to instruct on a lesser included offense was prejudicial, an appellate court may consider 'whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' [Citations.]" (*People v. Rogers* (2006) 39

29

Cal.4th 826, 870.) The strength of the evidence supporting Mize's attempted murder conviction lies in his own admissions that he stabbed his victim 16 times and broke a beer bottle on his head. The evidence suggesting he was merely guilty of assault was comparatively weak. It is thus not reasonably probable that the claimed error affected the verdict.

*Cumulative Error*

Appellants assert that cumulative error compels the reversal of their convictions. We have identified and ordered correction of one sentencing error. There is thus no error to cumulate. (See *People v. Myles* (2012) 53 Cal.4th 1181, 1225.)

DISPOSITION

The judgments are modified to stay appellants' sentences for active participation in a criminal street gang (count 5) pursuant to section 654. The trial court is directed to amend the abstracts of judgment to reflect the stays and to forward copies of the amended abstracts to the California Department of Corrections and Rehabilitation. As so modified, the judgments are affirmed.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:



GILBERT, P. J.



YEGAN, J.


30

Clifford R. Anderson, Judge

Superior Court County of Santa Barbara

_____

Diane E. Berley, under appointment by the Court of Appeal, for Defendant and Appellant Richard Manuel Nava, Jr.

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant Ruben Nicolas Mize.

Mark D. Lenenberg, under appointment by the Court of Appeal, for Defendant and Appellant Bryan S. Medinilla.

Susan B. Lascher, under appointment by the Court of Appeal, for Defendant and Appellant Raul Junior Diaz.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, J. Michael Lehmann, Deputy Attorney General, for Plaintiff and Respondent.